Douglas D. Winter (SBN 150795)
**RILEY & REINER**
801 S. Figueroa Street, 9th Floor
Los Angeles, California 90017
Telephone (213) 362-0123
Facsimile (213) 362-0124

Attorneys for Defendants
A.V.E.L.A., INC. d/b/a ART & VINTAGE
ENTERTAINMENT LICENSING AGENCY,
ART-NOSTALGIA.COM, INC., and
X ONE X MOVIE ARCHIVE, INC.,
LEO VALENCIA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLEISCHER STUDIOS, INC.,<br><br>          Plaintiff,<br><br>vs.<br><br>A.V.E.L.A., INC. d/b/a ART & VINTAGE ENTERTAINMENT LICENSING AGENCY, ART-NOSTALGIA.COM, INC., and X ONE X MOVIE ARCHIVE, INC., BEVERLY HILLS TEDDY BEAR CO., LEO VALENCIA, and DOES 1-10<br><br>          Defendants. | CASE NO.: CV 06-6229 FMC (MANx)<br><br>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>DATE:     April 21, 2008<br>TIME:     10:00 a.m.<br>CTRM:   750<br>JUDGE:  Honorable Florence Marie Cooper |

## I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this lawsuit, plaintiff Fleischer Studios, Inc. ("Fleischer") has accused defendants A.V.E.L.A. Inc. ("AVELA"), Art-Nostalgia.Com, Inc. ("Art Nostalgia"), X one X Movie Archive, Inc. ("X one X"), and Leo Valencia ("Mr. Valencia") of copyright and trademark infringement, including related state law claims.[1]   Specifically, Fleischer

---

[1]/   Fleischer voluntarily dismissed defendant Beverly Hills Teddy Bear Co. from this action on February 28, 2008.

1

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   AVELA's Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.   AVELA's Restored Betty Boop Posters  . . . . . . . . . . . . . . . . . . . . 3

      C.   AVELA Confirms That The Posters Were Not Previously Registered For
           Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      D.   AVELA Secures Copyright Protection for the AVELA Copyright Images  4

      E.   AVELA's Licensing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      F.   The Talkartoon Poster Entered The Public Domain in 1931. . . . . . . . . . . 5

      G.   Plaintiff's Claim of Copyright Ownership in Betty Boop  . . . . . . . . . . . . . 5

           1.   Plaintiff Is Not The Author Or Creator Of Betty Boop  . . . . . . . . . 5

           2.   The Chain of Title Demonstrates No Valid Claim of Copyright
                Ownership by Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                a.   The Original Copyright Registrations . . . . . . . . . . . . . . . . . . 6

                b.   Fleischer Studios Assigns To Paramount All Copyright And
                     Renewal Interests In And To The Betty Boop Cartoons,
                     Character And Booklets  . . . . . . . . . . . . . . . . . . . . . . . . . 7

                c.   Paramount Assigns The Betty Boop Cartoons to UM&M  . . 9

                d.   Paramount Assigns Its Interest In The Booklet "Betty BoopAnd
                     Her Gang" To Harvey Films . . . . . . . . . . . . . . . . . . . . . . 10

                e.   UM&M Claims Copyright Renewal In The Four Cartoons  10

                f.   Max Fleischer Claims Copyright Renewal Rights In "Betty,
                     Cartoon Character" and "Betty Boop And Her Gang." . . . . 10

                g.   Subsequent Agreements And Assignments. . . . . . . . . . . . 11

                h.   Plaintiff's Admissions At Its Deposition . . . . . . . . . . . . . . 12

III.  LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.   Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.   Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.   Unfair Competition and Trademark Infringement . . . . . . . . . . . . . . . . . 16

i

IV.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.   Plaintiff Cannot Establish Copyright Ownership of The Betty Boop Character.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.   There Are No Valid Renewals of Copyright of the Betty Boop Character . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.   The "Talkartoon" Movie Poster And The Character Entered The Public Domain No Later Than August, 1931. . . . . . . . . . . . . . . . 21

    B.   Plaintiff's Claims For Trademark Infringement And Unfair Competition Are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.   Plaintiff Cannot Rely On The Lanham Act To Revive That Which Is In The Public Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.   Plaintiff Cannot Use The Lanham Act To "End-Run" Copyright Law 23

        3.   Plaintiff Cannot Prove Secondary Meaning And Likelihood of Confusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ii

# TABLE OF AUTHORITIES

## CASES

AMF Inc. v. Sleekcraft Boats,
599 F.2d 341, 348-49 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Carol Cable Co. v. Grand Auto Inc.,
4 U.S.P. Q.2d 1056, 1061 (C.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 15

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Comedy III Prod. v. New Line Cinema,
200 F.3d 593, 595 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23, 24

Dastar Corp. v. Twentieth Century Fox Film Corp.,
539 U.S. 23 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Dollcraft Co. v. Nancy Ann Storybook Dolls, Inc.,
94 F.Supp. 1 (N.D. Cal. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Dr. Seuss Enterprises, L.P. v. Penguin Books U.S.A., Inc.,
109 F.3d 1394, 1404 & n.12 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Feist Publications, Inc. v. Rural Tel. Serv. Co.
499 U.S. 340, 361 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fleischer v. A.A.P., Inc.
163 F.Supp. 548 (S.D.N.Y. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fleischer v. A.A.P., Inc., et al.
222 F.Supp. 40 (S.D.N.Y. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fleischer v. W.P.I.X., Inc.
30 Misc.2d. 17; 213 N.Y.S.2d 632 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fred Fisher Music Co. v. M. Witmark & Sons,
318 U.S. 643 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

International Film Exch., Ltd v. Corinth Films, Inc.,
621 F.Supp. 631, 635 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

Levi Strauss & Co. v. Blue Bell, Inc.,
778 F.2d. 1352 1354 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Maljack Prods. v. Goodtimes Vidoe Corp.,
81 F.3d. 881, 887 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Matsushita Elec. Indus. Co. v. Zenith Radio,
475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

iii

Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co.,
  197 F.2d. 293 (9th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Religious Technology Ctr. v. Netcom On-Line Comm. Servs, Inc.,
  923 F.Supp. 1231, 1241 (N.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . 15, 17

Scherr v. Universal Match Corp.,
  417 F.2d. 497 (2d. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sony Pictures Entm't., Inc. v. Fireworks Entm't Group Inc.,
  137 F.Supp.2d. 1177, 1184 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . 16, 18

Sony Pictures Entm't, Inc. v. Foreworks Entm't Group, Inc.,
  137 F.Supp.2d. 1177, 1195 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . 24

Stewart v. Abend
  495 U.S. 207, 219-220 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Twin Book Corp. v. Walt Disney Co.,
  83 F.3d. 1162, 1166 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Urantia Found. v. Maaherra
  895 F.Supp. 1347, 1351 (D. Ariz. 1995), rev'd, 114 F.3d 955 (9th Cir. 1997) . . 15,
                                                                              16, 18

Walker v. TimeLife Films, Inc.
  615 F.Supp. 430, 435 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . 16

STATUTES

17 U.S.C. § 209 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

17 U.S.C. § 24 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17 U.S.C. § 304(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

17 U.S.C. § 304(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17 U.S.C. § 410(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

17 U.S.C. §§ 10, 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17 U.S.C., Trans. Supp. Provs., § 103 . . . . . . . . . . . . . . . . . . . . . . . 16, 21

RULES

Fed. R.Civ.P. Rule 30(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R.Civ.P. Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

iv

OTHER

1 Melville B. & David Nimmer, Nimmer on Copyright § 2.03[G] at 2-39 (2005) . . . . . 16

3 Melville B. & David Nimmer, Nimmer on Copyright § 12.11[C] at 12-206-207 (2005) 15

3 Melville B. & David Nimmer, Nimmer on Copyright § 9.05[A](1) at 9-40 (2005) . . . 20

4 Melville B. & David Nimmer, Nimmer on Copyright § 13.01[A] at 13-6 (2005) . . . . 15

4 Melville B. & David Nimmer, Nimmer on Copyright § 9.05 [D][1] a 9-84-85 . . . . . . 16

Defendants' Memo. of Points and Authorities In Support of Motion for Summary Judgment

@PFDesktop\:.ODMA/MHODMA/RRLA;rrla;133925;1 74620.965

1   alleges that it owns the copyright in the character Betty Boop, and that Defendants' use of

2   restored poster artworks depicting Betty Boop infringes said copyright. Plaintiff's claim

3   is without merit, as a matter of law.

4       Plaintiff cannot establish ownership of the copyright in the character Betty Boop,

5   which is fatal to Plaintiff's claim. Plaintiff is a California Corporation formed in 1992,

6   sharing the same name with now defunct New York and Florida corporations from the

7   1930's (when "Betty Boop" was created). Plaintiff concedes, as it must, that it is not the

8   author of any of the Betty Boop works, and as such it has the burden to establish its

9   copyright ownership through appropriate chain of title. As the undisputed facts show, the

10   Betty Boop character was copyrighted in 1932 by the former Fleischer Studios, Inc., and

11   any and all copyright and renewal rights in the character were later assigned to Paramount

12   Pictures ("Paramount") and others. Under the 1909 Copyright Act, renewal of said

13   copyright had to be made by the proper claimant by 1960, or protection therefor was

14   forever lost. Plaintiff has produced no valid renewal of the copyright. Instead, Plaintiff

15   relies on an application for copyright renewal filed by Max Fleischer, who is not a proper

16   claimant. As a result, the copyright in Betty Boop was forfeited, and the character went

17   into the public domain.

18       As a separate and independent reason Plaintiff cannot establish ownership, the

19   undisputed evidence is that the "Talkartoon" poster depicting the character Betty Boop

20   entered the public domain in 1931, before any valid copyright was obtained therefor.

21   Although earlier, undeveloped versions of the character Betty Boop were the subject of

22   copyright, the Talkartoon poster featured Betty Boop in her developed, female forum. As

23   such, the character was unprotected by copyright law as early 1931.

24       Plaintiff has also asserted claims based on alleged trademark infringement. They,

25   too are without merit. Plaintiff's use of vintage public domain movie posters do not

26   constitute trademark infringement. Recent case law has cautioned against an attempt to

27   misuse trademark law into areas occupied by copyright, as Plaintiff has done here.

28   / / /

2

## II.

## STATEMENT OF FACTS[2]

### A.   AVELA's Business.

AVELA is in the business, among other things, of creating new artistic works in print, graphic and lithographic mediums that are based on materials found in the public domain.  Specifically, AVELA identifies public domain publicity materials, movie posters and other publications use in prior years to advertise old plays, theatrical releases and motion pictures, and employs or contracts artisans to carefully restore those images, to add new colors, pigments and other creative expressions, and/or to incorporate those old images into new and original works.  AVELA also acquires original restorations done by others that similarly create new works from old public domain materials.  Through these restoration activities, materials from the golden age of motion picture production are brought back to life.  Indeed, in many cases, the old, public domain materials found by AVELA have fallen into disrepair and have lost their original luster and attractiveness, or are simply dilapidated.  (Declaration of Leo Valencia ("Valencia Decl."), ¶ 2)[3]

### B.   AVELA's Restored Betty Boop Posters.

AVELA has acquired and/or restored literally thousands of such public domain materials, movie posters and other publications.  Included among the works created by AVELA are restored movie posters relating to Betty Boop attached to the Valencia Decl.

---

[2]/   The material undisputed facts that are sufficient to form a basis for summary judgment are set forth in the Separate Statement of Uncontroverted Facts and Conclusion of Law filed concurrently herewith pursuant to Local Rule 56-1.

[3]/   Examples of restored movie posters related to Betty Boop are attached as Exhibit A to the Valencia Declaration.  These restored works are just some of many works created by AVELA or other restorers from public domain materials.  AVELA sells restored works such as these to collectors, movie historians and other persons interested in owning and displaying these beautiful images.  Valencia Decl., ¶ 3.  In addition to selling restored posters and other artistic materials, AVELA licenses various products, such as T-shirts, playing cards and other items.  Examples of such an article is attached to the Valencia Decl. as Exhibit D.

1   As Ex. A.  In each of the Betty Boop works, AVELA obtained the original posters and

2   either employed or contracted artisans to restore the images and add other creative

3   expressions.  (Valencia Decl. ¶ 3; Ex. A)

4   **C.   AVELA Confirms That The Posters Were Not Previously Registered For**

5   **Copyright**.

6          AVELA takes careful steps to comply with the copyright laws before making use

7   and modifying the old works it restores, or acquiring and using restored works from

8   others.  AVELA has no desire to infringe on any copyrights, and thus conducted

9   considerable investigation into the public record to verify and determine that the posters

10  were not subject to any registered copyright, and that these materials in fact fell into the

11  public domain.  AVELA learned that in addition to the posters, more than 50 Betty Boop

12  cartoons which had originally been registered for copyright were not renewed, thereby

13  also entering the public domain.  (Valencia Decl. ¶ 4; Ex. B)

14  **D.   AVELA Secures Copyright Protection for the AVELA Copyright Images**.

15         The copyrights for the restored materials distributed by AVELA are obtained by a

16  company called X one X Movie Archive, Inc. ("X one X"), a company also owned by Mr.

17  Valencia, the owner of AVELA.  X one X has obtained copyrights for all of the restored

18  works distributed by AVELA, including the Betty Boop posters.  (Valencia Decl. ¶ 6.)

19  Valencia Exhibit C are copies of the copyrights issued to X one X by the U.S. Copyright

20  Office, that grants X one X copyright protection to a printed work for two of the posters

21  that have an image of Betty Boop.  Notably, Plaintiff makes no claim in its complaint that

22  the X one X copyright is invalid or that the registration made by X one X was improper.

23  Plaintiff has never given either X one X or AVELA any notice, written or oral, of any

24  claim by Plaintiff that X one X's copyright is invalid.  At all times, AVELA has used the

25  AVELA Betty Boop poster in the belief that X one X has a valid and registered copyright

26  to the images.  (Valencia Decl. ¶ 6.)

27  **E.   AVELA's Licensing**.

28         AVELA licenses to third parties the right to manufacture and sell merchandise

4

1  utilizing AVELA's restored movie poster artwork, including the Betty Boop posters.

2  Pursuant to the terms of the licensing agreement between AVELA and its licensees,

3  AVELA's licenses are not permitted to use the restored movie poster artwork as a

4  trademark, to identify the source of the merchandise. (Valencia Decl. ¶ 10)

5      All of the packaging material of the licensee is required to include a trademark

6  disclaimer with words to the effect tha it is "property of X one X Archive, Inc." As an

7  example, a Betty Boop figure manufactured by an AVELA licensee reflects that its

8  packaging contains the actual restored Betty Boop poster. (Valencia Decl. ¶ 11)

9  **F.    The Talkartoon Poster Entered The Public Domain in 1931**.

10     The Talkartoon poster attached as Ex. A to the Valencia Decl., which depicts Betty

11  Boop in her female form (with earrings instead of dog-ears), was published and

12  distributed without any copyright notice being affixed or included. (Poole Opinion ¶ 28;

13  Ex. R to Winter Decl.)  It was created and released in approximately August, 1931, well

14  prior to the release date of any of the cartoons featuring Betty Boop in her female form

15  and well prior to the copyright on "Betty Boop And Her Gang" (Id.) (Winter Decl., Ex. D)

16   Plaintiff has no information regarding the publication of the Talkartoon movie poster.

17  (Plaintiff Depo. p. 133:20-22; Ex. A to Winter Decl.)

18     None of AVELA Betty Boop posters are copies from film clips or cells from any

19  cartoons featuring Betty Boop. (Poole Opinion ¶ 29; Ex. R to Winter Decl.)

20  **G.    Plaintiff's Claim of Copyright Ownership in Betty Boop**.

21     **1.    Plaintiff Is Not The Author Or Creator Of Betty Boop**.

22     Plaintiff Fleischer Studios, Inc. ("Plaintiff") is a California corporation which was

23  formed in 1992. (Exhibit 1 to Defendants' Request for Judicial Notice ("RJN")) Plaintiff

24  claims ownership of the copyright in and to the character Betty Boop, not as author or

25  creator, but instead as "the legal and/or beneficial owner." (Complaint ¶ 1)  In this regard,

26  Plaintiff relies upon copyright registrations and renewals of Betty Book works obtained

27  by others beginning in the early 1930's as follows:

28     "Dizzy Dishes" cartoon          -        Copyright registered August 9, 1930 by

5

|  |  |  |
|---|---|---|
|  |  | Paramount Public Corp. ("Paramount") ; Renewals registered August 30, 1957 by U.M. & M. TV Corp. ("UM&M"). |
| "Silly Scandals" cartoon | - | Copyright registered May 23, 1931 by Paramount; Renewal registered August 1, 1958 by UM&M. |
| "Betty, Cartoon Character" Booklet |  | Copyright registered July 1, 1931 by Fleischer Studio, Inc. ("FSI")[4]; Renewal registered June 25, 1959 by Max Fleischer. |
| "Minding the Baby: cartoon | - | Copyright registered September 26, 1931 by Paramount; Renewal registered December 30, 1958 by UM&M. |
| "Betty Boop For President" cartoon |  | Copyright registered November 2, 1932 by Paramount; Renewal registered November 10, 1959 by UM&M. |
| "Betty Boop and Her Gang" | - | Copyright registered November 19, 1932 by F.S.I.; Renewal registered December 28, 1959 by Max Fleischer. |

(Complaint ¶¶ 16-17)

**2.    The Chain of Title Demonstrates No Valid Claim of Copyright Ownership by Plaintiff.**

**a.    The Original Copyright Registrations.**

Plaintiff (through its President and C.E.O., as designee pursuant to Fed. R.Civ.P. Rule 30(b)(6)) testified that all of the Betty Boop cartoons, including the four (4) above, were produced by F.S.I. and financed by Paramount.  (Plaintiff Depo.), p. 31:7-12; Ex. A to Declaration of Douglas D. Winter ("Winter Decl."))   Accordingly, on the Copyright Registration Certificates for each of the Betty Boop cartoons referenced in the complaint, Paramount is designated as the "Author of the motion picture." (Winter Decl. ¶ 3; Ex. B thereto)

The copyright Registration Certificate for the book "Betty, Cartoon Character"

---

[4]/    As discussed, _infra_, FSI was a New York corporation which dissolved in 1938 after transferred all of its assets to Fleischer Studios, Inc., a Florida corporation. The Florida corporation dissolved in 1946.

Defendants' Memo. of Points and Authorities In Support of Motion for Summary Judgment
@PFDesktop\::ODMA/MHODMA/RRLA,rrla;133925;1 74620.965

1  reflects that FSI is the registrant.  There is no other name identified as the author on the

2  certificate.  (Winter Decl. ¶ 4; Ex. C)

3  Similarly, the copyright Registration Certificate for "Betty Boop and Her Gang"

4  reflects that FSI is the registrant, but there is no other name identifying the author.

5  (Winter Decl. ¶ 5; Ex. D)

6  **b.**   **Fleischer Studios[5] Assigns To Paramount All Copyright And**

7  **Renewal Interests In And To The Betty Boop Cartoons,**

8  **Character And Booklets.**

9  By agreement dated May 24, 1941, Fleischer Studios assigned to Paramount all of

10  its assets, including all cartoons and all of the characters contained therein, and all rights,

11  copyrights, renewals, licenses, privileges and property therein.  In this regard, the May 24,

12  1941 Agreement provides, in pertinent part:

13  "Third: The Producer **[Fleischer Studios]** shall and does hereby transfer,
sell assign and convey to Paramount, its successors and assigns,

14  absolutely and forever, throughout the world, free and clear of all liens,
encumbrances, pledges, hypothecations, claims and demands whatsoever,

15  each and every motion picture cartoon *** heretofore or hereafter
produced by or for the Producer or any of its predecessors in interest ***

16  on or before August 31, 1941, including but not limited to all parts
thereof, all cut-outs not actually included therein, all characters

17  contained therein or created or used therefor, all copyrights, copyright
renewal and extension rights and renewed and extended copyrights

18  therein and thereto (and Paramount shall also have the right to obtain
and acquire such renewals and extensions and such renewed and

19  extended copyrights in the name of the Producer and otherwise and the
Producer shall also assign to Paramount, its successors and assigns, all

20  such renewed and extended copyrights when the same shall come into
existence) and all rights, licenses, privileges and property therein, ***

21  all stories, treatments, adaptations, continuities, scripts, literary,
dramatic and other material *** contained in or upon or from which

22  any one or more of said motion picture cartoons is or has been or shall
be based or adapted *** and all copyrights therein and thereto, and all

23  rights thereunder; all of the foregoing, which has been produced or come

24  

25  ⁵/   A few years before the Assignment to Paramount, F.S.I. distributed all of its
assets to its sister company, Fleischer Studios, Inc. of Florida (hereinafter "Fleischer

26  Studios").  Specifically, as of December 28, 1938, all of FSI's activities which had

27  previously been carried on in New York were then being carried out in Florida, and as a

28  result, FSI (the old New York Corp.) was dissolved and its assets distributed to Fleischer
Studios. (Winter Decl. ¶ 6, Ex. E, pp. FS 842-849)

7

into existence, **it is hereby confirmed Paramount either already owns (such ownership having arisen immediately upon the production or making of the same or any parts thereof or of any scenes or sequences therefor) or shall and does hereby own, absolutely and forever, throughout the world...**Paramount may do do and (sic) and all things, and make any and all uses of any and all of the foregoing and with respect thereto, and shall be entitled to any and all sums derived therefrom...without any payment or accounting whatsoever to the Producer or to any others. The cash consideration to be paid by Paramount to the Producer for the sale, transfer and conveyance contained in this Article THIRD shall be the sum of...($483,922.83)..."  (emphasis added)

(Winter Decl. ¶ 7; Ex. F, pp. FS 938, 942.)

Concurrently with the execution of the May 24, 1941 agreement (the "Agreement") between Fleischer Studios and Paramount, Max Fleischer (President of Fleischer Studios) and David Fleischer (Secretary of Fleischer Studios) entered into a letter agreement with Paramount, pursuant to which the Fleischers agreed, inter alia, (1) that they approved of all provisions in the Agreement concerning the use of their names, the name "Fleischer" and the name "Fleischer Studios"; (2) they would faithfully and fully perform all services that the Agreement specifics they are to perform or Fleischer Studios, Inc. is to cause them to perform; (3) nothing shall divest from Paramount or affect its exclusive rights, titles and interests in and to all of the motion picture cartoons and related rights, copyrights and property referenced to in the Agreement; and (4) that they would execute and deliver any and all documents necessary in connection with the Agreement. (Winter Decl. ¶ 8; Ex. G, pp. FS 937-938)

In July, 1941, at a meeting of the stockholders an directors, Fleischer Studios formally approved the May 24, 1941 Agreement with Paramount.  (Winter Decl. ¶ 6; Ex. E, pp. FS 860-866)

Fleischer Studios further assigned to Paramount all of its copyright and renewal interests in and to several drawings and books, including the two booklets, "Betty, Cartoon Character" and "Betty Boop and Her Gang."  In this regard, by assignment dated July 11, 1941 and recorded August 4, 1941, Fleischer Studios assigned to Paramount, in relevant part, all of its

"right, title and interest in and to the copyrights heretofore taken out by

8

[Fleischer Studios, Inc.] listed below, of <u>which we are the proprietors</u>, to wit:

\* \* \*

For a book entitled "Betty, Cartoon Character", published June 29th, 1931 and registered June 29th, 1931 under Class AA, No. 73229;

For a book entitled "Betty Boop and Her Gang", published December 15th, 1932 and registered December 19th, 1932 under Class AA, No. 111104

\* \* \*

With all of our literary property, right, title and interest in and to the foregoing, and all rights whatsoever under said copyrights, hereby authorizing the said Paramount Pictures, Inc., its successors and its assigns, and its or their designees, to apply for and receive the renewals and extensions of said copyrights, in the name or names of said Fleischer Studios, Inc. and any others, said Fleischer Studios Incorporated hereby agreeing to assign and to cause the assignment of, such renewal and extended copyrights, as and when the same shall come into existence, to said Paramount Pictures, Inc., its successors and assigns."

(Winter Decl. ¶ 9; Ex. H, pp. FS 64, 67)[6]

### c.   <u>Paramount Assigns The Betty Boop Cartoons to UM&M</u>.

By agreement dated November 8, 1955, Paramount assigned numerous cartoons, including the four cartoons listed in Plaintiff's complaint, to UM&M. Specifically, Paramount assigned "all of Paramounts' right, title and interest" in and to the cartoons and "any copyrights subsisting therein." In the agreement, "Dizzy Dishes", "Silly Scandals" and "Minding the Baby" are identified as "Miscellaneous Cartoons", while "Betty Boop for President" is identified therein as a "Betty Boop Cartoon."[7] (Winter Decl. ¶ 10; Ex. I; pp. FS 578, 582)

------------------------------------------------------------

[6]/   In a series of lawsuits brought in the late 1950's, Dave Fleischer and Max Fleischer unsuccessfully challenged the scope and enforceability of the May 24, 1941 agreements between Fleischer Studios and Paramount. In published decisions, the courts confirmed that Fleischer Studios validly assigned to Paramount, <u>inter</u> <u>alia</u>, all copyrights and renewal rights in and to all of the cartoons produced by FSI. <u>See</u>, <u>Fleischer v. W.P.I.X., Inc.</u> 30 Misc.2d. 17; 213 N.Y.5.2d 632 (1961); <u>Fleischer v. A.A.P., Inc., et al.</u> 222 F.Supp. 40 (S.D.N.Y. 1963); <u>Fleischer v. A.A.P., Inc.</u> 163 F.Supp. 548 (S.D.N.Y. 1958) attached to Defendants' Request for Judicial Notice filed concurrently herewith. (RJN; Exhs. 2-4)

[7]/   As part of the assignment to UM&M, Paramount also assigned approximately 90 additional Betty Boop cartoons. (Winter Decl.; Ex. I)

9

1
2

      **d.**      **Paramount Assigns Its Interest In The Booklet "Betty Boop And Her Gang" To Harvey Films.**

3      By assignment dated June 27, 1958, Paramount assigned to Harvey Films, Inc.

4 ("Harvey") 220 cartoons and other short subjects, as well as the booklet "Betty Book And

5 Her Gang."  Specifically, Paramount assigned to Harvey "all right, title and interest of

6 Paramount in and to the copyrights of all the cartoon characters listed in Exhibit A," and

7 included in said list the Booklet "Betty Boop And Her Gang", with its original copyright

8 registration date and entry number (Winter Decl. ¶ 11; Ex. J, pp. FS 79-83, FS 120).  The

9 Booklet "Betty, Cartoon Character" was not included in the assignment. Id.

10      On July 1, 1958, Harvey assigned "Betty Boop And Her Gang", to Harvey Famous

11 Cartoons, a partnership.  Specifically, the assignment provides that Harvey assigns "all its

12 right, title and interest in an to all of the cartoon characters listed in Exhibit "A","

13 (included in said list is the Booklet "Betty Boop And Her Gang") which "were heretofore

14 assigned to said Assignor by written assignment executed by Paramount...and in and to all

15 renewals and extensions of said copyrights that may be secure..." (Winter Decl. ¶ 12; Ex.

16 K, pp. FS 365, 367)

17      **e.**      **UM&M Claims Copyright Renewal In The Four Cartoons.**

18      UM&M, who obtained the four cartoons referenced in Plaintiff's complaint from

19 Paramount in 1955, claimed renewal of the copyright between 1957 and 1959 in each

20 cartoon as "proprietor of copyright in a work made for hire." (Winter Decl. ¶ 13; Ex. L,

21 pp. FS 42-52)  In each renewal registration, UM&M identifies Paramount as the

22 author(s) who contributed copyrightable material to the work. Id.

23      **f.**      **Max Fleischer Claims Copyright Renewal Rights In "Betty, Cartoon Character" and "Betty Boop And Her Gang."**

25      Despite the fact that (1) FSI was the original copyright claimant and did not

26 identify Max Fleischer as the "author"; (2) that Fleischer Studios (the Florida copyright

27 corp. successor to FSI's assets) assigned to Paramount all copyright and renewal interests

28 in and to "Betty, Cartoon Character" and "Betty Boop And Her Gang" and the characters

10

therein; and (3) Paramount thereafter assigned said rights to Harvey, it was Max Flesicher who filed Applications for Registration of a Claim to Renewal Copyright in both "Betty, Cartoon Character" and "Betty Boop And Her Gang."

Specifically, by Renewal Registration No. 241400, dated June 25, 1959, Max Fleischer personally claimed the renewal copyright in the work "Betty - Cartoon Character." In said application, Max Fleischer states that he is claiming renewal as "the author," and provides his own name as the author(s) who contributed copyrightable matter to the work. There is no signature appearing in the renewal form certifying the correctness of the statements contained therein. (Winter Decl. ¶ 14; Ex. M, pp. 47-48)

By Renewal Registration No. 247925 dated December 28, 1959, Max Fleischer personally claimed the renewal copyright in the work "Betty Boop And Her Gang", claiming as "The Author" and stating that he was the author who contributed copyrightable material to the work.  (Winter Decl. ¶ 15; Ex. N thereto, pp. 54-55)[8]

### g.   <u>Subsequent Agreements And Assignments</u>.

Plaintiff has produced certain documents from the 1970's and thereafter in this action which apparently purport to be part of Plaintiff's chain of title of copyright.[9]

In a September 29, 1977 Assignment between National Telefilm Associates, Inc. ("NTA") and Fleischer Studios, Inc., a New York corporation ("Fleischer New York"), Fleischer New York[10] represents that it is the owner of the renewal copyright in the

_____

[8]/   As discussed, <u>infra</u>, the copyright renewals by Max Fleischer were legally invalid. As a result, the characters as depicted in "Betty, Cartoon Character" and "Betty Boop And Her Gang" went into the public domain at the conclusion of the initial 28 year copyright term, losing all copyright protection.

[9]/   Again, because the Betty Boop characters went into the public domain no later than 1961 (following the 28 year copyright term with no valid renewal), any subsequent assignments of rights could not effectively transfer any copyright interest to Plaintiff.

[10]/   Despite the same name, Fleischer New York is different entity from FSI, the original New York corporation and original copyright registrant, which dissolved in

11

character "Betty Boop" and others in the booklet "Betty Boop And Her Gang" and that it obtained such renewal ownership by transfer from Max Fleischer (who was then deceased). (Winter Decl. ¶ 16; Ex. O, pp. FS 421, 426)   Plaintiff has not produced in this action any evidence of this purported transfer of renewal rights from Max Fleischer to Fleischer New York, and Plaintiff admitted in its deposition that it was unaware of any said transfer. (Winter Decl. ¶ 21; Ex. A, p. 120:21-23)

A 1980 Assignment from Harvey to Fleischer New York purports to assign all copyrights and renewals thereof secured on the Betty Boop "cartoon feature", including characters in the feature, as set forth in the Exhibit attached to the assignment and the referenced copyright registration. (Winter Decl. ¶ 17; Ex. P, pp. FS 373)   A review of the Exhibit to the assignment reflects a copyright registration no. MP3415 and a renewal registration no. 258317, which does not relate to any of the Betty Boop works claimed by Plaintiff in its complaint. (Id., p. FS 377)

Plaintiff produced another later assignment, dated May 31, 1983, between the heirs of Max Fleischer and Fleischer New York.  By said assignment the heirs claim to be "proprietors" of the renewal copyrights taken out by Max Fleischer and purport to assign said rights to Fleischer New York. (Winter Decl. ¶ 18; Ex. Q, pp. FS 153-155)   Plaintiff has not produced in this action any evidence of any transfer of said renewal rights to the Plaintiff.  Further, there have been no documents produced or disclosed by Plaintiff which reflect any transfer of any rights from Fleischer New York to the Plaintiff.  (Winter Decl. ¶ ¶ 20-23)

### h.      Plaintiff's Admissions At Its Deposition.

Plaintiff's corporate designee, who was designated as the person most knowledgeable regarding, inter alia, Plaintiff's alleged copyright ownership in the Betty Boop character, admitted the following at his deposition:

---

1938. It is also a difficult entity from Florida Studios (Fla.), which dissolved in 1946 after assigning all rights to Paramount.  Finally, it is also a different entity from the Plaintiff, which is a California corporation incorporated in 1992.

12

- Plaintiff admits there were approximately 108 Betty Boop cartoons or films made, claims no copyright ownership in any of them, and that some of the cartoons are in the public domain. (p. 125:14-17; p. 128:15-19; p. 85:23 - p. 86:9; Ex. A to Winter Decl.)

- Plaintiff has no understanding regarding the facts of the employment relationship between Max Fleischer and the original Fleischer Studios, Inc. at the time "Betty Boop, Cartoon Character" and "Betty Boop And Her Gang" were created, and therefore cannot dispute that Fleischer Studios, Inc. (as opposed to Max Fleischer) was the author of said works. (Id. at pp. 106:14 - 107:11).

- Plaintiff does not know how Fleischer New York purportedly acquired renewal rights from Max Fleischer in "Betty Boop, Cartoon Character" or "Betty Boop And Her Gang." (Id. at p. 120:21-24)

### III.

### LEGAL STANDARD

**A.    Summary Judgment.**

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for granting a motion for summary judgment. It states in part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

This standard has been explained by the Supreme Court of the United States in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In Anderson, the Court set out the requisites needed to show there is no genuine issue as to a material fact.

Only disputes over facts that might affect the outcome of the

13

1    suit under the governing law will properly preclude the entry

2    of summary judgment. Factual disputes that are irrelevant or

3    unnecessary will not be counted.

4  477 U.S. at 248.

5    Regarding the existence of a genuine issue of material fact, the Court held that

6  summary judgment is not appropriate if "the evidence is such that a reasonable jury could

7  return a verdict for the nonmoving party." Anderson, supra, 477 U.S. at 248. However,

8  the Court also noted that "there is no issue for trial unless there is sufficient evidence

9  favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249. The

10 nonmoving party has the burden of producing operative facts, and the "mere existence of

11 a scintilla of evidence in support of the plaintiff's position will be insufficient; there must

12 be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. If the

13 operative facts are not presented, summary judgment is appropriate. Id.

14    Once the moving party has met its burden under Rule 56(c), the nonmoving party

15 "must do more than simply show that there is some metaphysical doubt as to the material

16 facts." Matsushita, 475 U.S. at 586. However, any inferences from the underlying facts

17 must be viewed in the light most favorable to the nonmoving party. Id. at 587.

18    In Celotex, the Court explained that the nonmoving party must designate specific

19 facts showing a genuine issue for trial. Summary judgment is appropriate if a party, after

20 adequate time for discovery, "fails to make a showing sufficient to establish the existence

21 of an element essential to that party's case, and on which that party will bear the burden of

22 proof at trial." 477 U.S. at 322. The moving party is not required to prove the absence of

23 a genuine issue of fact, even with respect to an issue on which the nonmoving party bears

24 the burden of proof. Id. at 325. "Instead . . . the burden on the moving party may be

25 discharged by 'showing' – that is, pointing out to the district court – that there is an

26 absence of evidence to support the nonmoving party's case." Id. The Court also stated

27 that "[o]ne of the principal purposes of the summary judgment rule is to isolate and

28 dispose of factually unsupported claims or defenses," id. at 323-24, and that the summary

14

1  judgment procedure should not be regarded as a "disfavored procedural shortcut" but

2  should be viewed as an "integral part of the Federal Rules as a whole, which are designed

3  to secure the just, speedy and inexpensive determination of every action." Id. at 327.

**B.  Copyright Infringement**

5      Copyright infringement requires the plaintiff to prove two elements: (1) ownership

6  of a valid copyright, and (2) copying of constituent elements of the work that are original.

7  Feist Publications, Inc. v. Rural Tel. Serv. Co. 499 U.S. 340, 361 (1991).

8      Plaintiff's ownership breaks down into the following constituent parts: (1)

9  originality in the author; (2) copyrightability of the subject matter; (3) a national point of

10  attachment of the work, such as to permit a claim for copyright; (4) compliance with

11  applicable statutory formalities; and (5) if the plaintiff is not the author (as here) a transfer

12  of rights or other relationship between the author and the plaintiff so as to constitute the

13  plaintiff the valid copyright claimant.  4 Melville B. & David Nimmer ("Nimmer"),

14  Nimmer on Copyright § 13.01[A] at 13-6 (2005); see also, Carol Cable Co. v. Grand Auto

15  Inc., 4 U.S.P. Q.2d 1056, 1061 (C.D. Cal. 1987).

16      Under the current Act, a certificate of registration from the U.S. Register of

17  Copyright has *prima facie* evidence of the validity of the copyright and of the facts stated

18  in the certificate.  17 U.S.C. § 410(c).  A certificate filed pursuant to the 1909 Act

19  accorded the presumption to "the facts stated therein", such as the statement of

20  authorship.  17 U.S.C. § 209 ("1909 Act").  However, the *prima facie* evidence provision

21  does not apply to a copyright renewal certificate.  Urantia Found. v. Maaherra 895

22  F.Supp. 1347, 1351 (D. Ariz. 1995), *rev'd*, 114 F.3d 955 (9th Cir. 1997).

23      Where, as here, the Plaintiff (Fleischer Studios Inc., a Ca. Corp.) is not the author,

24  it is the plaintiff's burden to prove its chain of title through the original copyright

25  claimant.  Religious Technology Ctr. v. Netcom On-Line Comm. Servs, Inc. 923 F.Supp.

26  1231, 1241 (N.D. Cal. 1995); see, also, 3 Nimmer, Nimmer on Copyright § 12.11[C] at

27  12-206-207 (2005).

28      The 1909 Act, provided statutory copyright protection for an initial term of 28

15

1   years, plus a 28-year renewal term.  17 U.S.C. § 24.  If at the end of the 28-year term, the

2   copyright was not validly renewed, the copyright was forfeited and lost.  Id.; see also, N.

3   4 Nimmer, Nimmer on Copyright § 9.05 [D][1] a 9-84-85; see also, Urantia Found. V.

4   Maaherra, supra, 114 F.3d at 962 (forfeiture of copyright will occur when renewal is

5   made by wrong claimant, rather than right claimant).  Upon such forfeiture, the previously

6   copyrighted work enters the public domain.  International Film Exch., Ltd v. Corinth

7   Films, Inc., 621 F.Supp. 631, 635 (S.D.N.Y. 1985)

8        Works that entered the public domain before the current Copyright Act's effective

9   date (January 1, 1978) could not be eligible for copyright protection.  17 U.S.C., Trans.

10   Supp. Provs., Sec. 103.  1 Nimmer, Nimmer on Copyright § 2.03[G] at 2-39 (2005).

11   Copyright protection does not extend to "material traceable to common sources or sources

12   in the public domain, and scenes a faire."  Sony Pictures Entm't., Inc. v. Fireworks Entm't

13   Group Inc., 137 F.Supp.2d. 1177, 1184 (C.D. Cal. 2001) (quoting Walker v. TimeLife

14   Films, Inc. 615 F.Supp. 430, 435 (S.D.N.Y. 1985)

15   **C.**   **Unfair Competition and Trademark Infringement.**

16        The primary concern of the law of unfair competition "is with protecting

17   consumers from confusion as to the source."  Dr. Seuss Enterprises, L.P. v. Penguin

18   Books U.S.A., Inc., 109 F.3d 1394, 1404 & n.12 (9th Cir. 1997). "In determining whether

19   confusion between related goods is likely, the following factors are relevant: (1) strength

20   of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

21   confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to

22   be exercised by the purchaser; (7) defendant's intent in selecting the mark; and, (8)

23   likelihood of expansion of the product lines."  AMF Inc. v. Sleekcraft Boats, 599 F.2d

24   341, 348-49 (9th Cir. 1979).  As detailed below, it is settled trademarks protected under

25   the Lanham Act cannot be exercised in a manner that would effectively end-run the

26   Copyright Act – where the material in question has fallen into the public domain, it is

27   beyond Lanham Act protection.  Comedy III Prod. v. New Line Cinema, 200 F.3d 593,

28   595 (9th Cir. 2000).  And further, even if it were possible for Plaintiff to claim trademark,

16

1  it bears a heavy burden to show "secondary meaning" and likelihood of confusion that

2  cannot, as a matter of law, be established in this case.

### IV.

### DISCUSSION

**A.** **Plaintiff Cannot Establish Copyright Ownership of The Betty Boop Character.**

    **1.** **There Are No Valid Renewals of Copyright of the Betty Boop Character.**

        It is incumbent upon to Plaintiff, who is not the claimed author, to prove its chain of title through the original copyright claimant. <u>Religious Technology Ctr.</u>, <u>supra</u>, 923 F.Supp. at 1241. This Plaintiff cannot do, as a matter of law.

        Plaintiff has no valid copyright in the character Betty Boop. As the undisputed facts and their application to the well-established legal principles demonstrate, no valid renewal of copyright was claimed in and to the Betty Boop character, including its depiction in the booklet "Betty Boop And Her Gang" or an earlier drawing in "Betty, Cartoon Character." As such, the character went into the public domain, forfeiting any and all copyright protection. This is dispositive and fatal to Plaintiff's claim.

        Although this action is brought under the Copyright Act of 1976, the operative facts relating to registration and renewal of the Betty Boop works took place while the 1909 Act was still effective,[11] and the claims to rights in the Betty Boop character are to be determined in accordance with the 1909 Act. <u>International Film Exchange</u>, <u>supra</u>, 621 F.Supp. at 633.

        Under the 1909 Act, statutory copyright protection attached and endured for

---

[11]/     Although the 1996 Act (17 U.S.C. § 304(b)) dealing with renewal of copyrights was made effective upon enactment, it applies to renewal registrations made between December 31, 1976 and December 31, 1997 and merely provides for an extension of the renewal term. Here, the renewal registration of the Betty Boop booklets had to be made prior to December 31, 1960, and therefore the renewal issue is governed by the 1909 Act.

17

1   twenty-eight years from the date of first publication with notice.  17 U.S.C. § 24 (1976)

2   (1909 Act) (superseded).  Thereafter, an application for renewal of copyright would have

3   to have been filed with the Copyright Office within one year prior to the expiration of the

4   original term of copyright in order to extend the copyright protection afforded by the

5   statute.  International Film Exchange, supra, 621 F.Supp. at 634-635.  In this case,

6   therefore, the initial term of copyright in the Betty Boop character as she is depicted in the

7   booklets "Betty, Cartoon Character" or "Betty Boop And The Gang" expired July 1, 1959

8   and December 19, 1960, respectively.  An application for valid renewal would have had

9   to have been filed between July 1, 1958 and 1959 for "Betty, Cartoon Character", and

10  between December 19, 1959 and December 19, 1960 for "Betty Boop And Her Gang."

11       It is well-settled that forfeiture of the copyright will occur when copyright renewal

12  is made by the wrong claimant.  Urantia Found, supra, 114 F.3d. at 962.  Upon such

13  forfeiture, the previously copyrighted work enters the public domain.  International Film

14  Exchange, supra, 621 F.Supp. at 635.  Such public domain works are not eligible for

15  copyright protection.  Sony Pictures Entm't., supra, 137 F.Supp.2d. at 1184.

16       Max Fleischer, who filed applications claiming renewal of the copyrights to the

17  above booklets, was the wrong renewal claimant.[12]  As the undisputed facts demonstrate,

18  FSI claimed the original copyright in its own name, and on the registration did not

19  identify Max Fleischer, (or anyone else other than itself) as the author.[13]

20       Moreover, Fleischer Studios (the Fla. successor to FSI) validly assigned its

21  copyright and renewal rights in the Betty Boop works (and other works) to Paramount in

22  1941.  The language in the agreements couldn't be more clear.  For example, in the May

23  24, 1941 agreement, Fleischer Studios assigned "each and every motion picture cartoon",

24  
_____

25       [12]/    No presumption of validity applies to a copyright renewal certificate.
    Urantia Found., supra, 895 F.Supp. at 1351, rev'd on other grounds 114 F.3d. 955.
26  

27       [13]/    Under the 1909 Act, presumptive validity attaches to "the facts stated
    therein" in the certificate of copyright registration.  Therefore, the presumption is that
28  FSI, the corporate entity, is the author and owner of the copyright.

18

1   "all characters contained therein," and "all copyright, copyright renewal and extension

2   rights" to Paramount. (See Ex. F to Winter Decl., pp. FS 938, 942)  In the July 11, 1941

3   assignment, Fleischer Studios, as the "proprietor" of the two Betty Boop booklets,

4   assigned its copyright and renewal interests therein to Paramount. (See Ex. H to Winter

5   Decl., pp. FS 64, 67)  Max Fleischer himself, along with his brother Dave, personally

6   agreed that nothing would divest Paramount or affect the copyrights and renewal rights

7   which Fleischer Studios assigned to Paramount. (Ex. G to Winter Decl., pp. FS 937-938)

8        As noted above, the Fleischer have previously unsuccessfully sought to extricate

9   themselves from the legal effect of the 1941 Assignment to Paramount. (See RJN; Exs. 2-

10  4)  Plaintiff in this action similarly cannot seek to create a right of renewal in Max

11  Fleischer, as the purported "author" of the works. First, Max Fleischer and Fleischer

12  Studios represented and warranted that FSI was the "proprietor" of the works. Plaintiff

13  alleges in its complaint that Max Fleischer "created" the Betty Boop character, but

14  Plaintiff has admitted that it has no evidence as to the employment relationship at the time

15  of creation between Max Fleischer and FSI, the admitted producer of the works and the

16  original copyright claimant, or as to whether Paramount financed FSI's production.[14]

17       Under the 1909 Act, parties could agree, as part of their employment relationship,

18  that copyright ownership in works produced was reserved to the individual creator as

19  opposed to the employer. Scherr v. Universal Match Corp., 417 F.2d. 497 (2d. Cir. 1969)

20   Plaintiff has produced no such agreement providing that Max Fleischer, as opposed to

21  FSI (the "proprietor", producer and registered copyright owner of the works) was the

22  author of the works. Again, Plaintiff has admitted having no knowledge regarding this

23  subject. The Act's renewal provision permits the proprietor, not the author, to claim

24

25       [14]/    Plaintiff also admitted that Paramount financed FSI's production of all of

26  the Betty Boop cartoons, and Paramount obtained the copyrights on the four cartoons at

27  issue as the "author." (Plaintiff Depo.; Winter Decl., Ex. A; p. 31:7-12.)  Plaintiff has no
    information as to whether Paramount also financed the booklets FSI registered for

28  copyright. (Plaintiff Depo.; Winter Decl., Ex. A, p 33:1-10.)

19

1   renewal where the work was copyrighted by the proprietor.  17 U.S.C. § 304(a).

2       Next, Plaintiff cannot rely on the "second chance" provision provided to authors to

3   renew copyright.  An assignment of renewal rights before the original copyright expires is

4   valid against the world if the author is alive at the commencement of the renewal period.

5   <u>Fred Fisher Music Co. v. M. Witmark & Sons</u>, 318 U.S. 643 (1943).  If the author dies

6   before the renewal period, the assignee only obtained an unfulfilled expectancy interest in

7   the renewal, and the deceased author's next of kin obtain the renewal.  <u>Stewart v. Abend</u>

8   495 U.S. 207, 219-220 (1990).  Obviously, that is not the situation here, as Max Fleischer

9   (assuming, <u>arguendo</u>, he was the "author") was alive at the time of the renewal.

10      The facts further demonstrate that in 1955 Paramount assigned the Betty Boop

11  cartoons to UM&M and in 1958 assigned the "Betty Boop And Her Gang" booklet to

12  Harvey.  It is undisputed that neither Paramount nor Harvey, who were the only potential,

13  valid renewal claimants of the booklets between 1958 and 1960 to claim copyright

14  renewal thereof, failed to do so.  The only "renewal" was Max Fleischer's invalid claim of

15  renewal of the copyright in and to the booklets all the characters therein.  As a result of

16  the invalid renewal, any copyright in the booklets and the characters therein, including

17  Betty Boop, was lost.  The Betty Boop character thus went into the public domain,

18  prohibiting any copyright ownership by Plaintiff (or anyone else) and precluding any

19  claim for copyright infringement against Defendants.

20      None of the subsequent "chain of title" documents produced by Plaintiff in this

21  case can change the fact that the Betty Boop character entered the public domain.  Once

22  the twenty-eight year copyright term expired by virtue of no proper renewal, copyright

23  protection in the Betty Boop character was forever lost.  As succinctly stated in a leading

24  treatise: "The formality of renewal was hence an absolute condition to copyright

25  subsistence past the 28th year."  3 Nimmer, <u>Nimmer on Copyright</u> § 9.05[A](1) at 9-40

26  (2005).

27      It is anticipated that Plaintiff will attempt to argue that it owns the copyright in the

28  Betty Boop character as depicted in the Betty Boop cartoons.  This argument, too, misses

20

Defendants' Memo. of Points and Authorities In Support of Motion for Summary Judgment
@PFDesktop\:.ODMA/MHODMA/RRLA;rrla;133925;1 74620.965

1    the mark.  The Betty Boop character went into the public domain no later than December

2    20, 1960.  Plaintiff did not even exist until its incorporation in 1992, and moreover has

3    not produced any chain of title demonstrating any ownership in the cartoons.  Plaintiff has

4    expressly admitted that it does not own any copyright in the Betty Boop cartoons.  Finally,

5    more than 50 of the Betty Boop cartoons are in fact themselves in the public domain.

6    (See, Valencia Decl. ¶ 4; Ex. B.)

7        2.    **The "Talkartoon" Movie Poster And The Character Entered The**

8            **Public Domain No Later Than August, 1931**.

9        Assuming Plaintiff could establish its chain of title and/or the Betty Boop booklet

10   renewals were properly renewed (it cannot), Plaintiff cannot prevail in its copyright claim

11   because the Betty Boop character was injected into the public domain no later than

12   August, 1931.  Hence the Betty Boop character was not longer eligible for copyright

13   protection.

14       It is well established that a work published before January 1, 1978 without proper

15   copyright notice entered the public domain and not be eligible for copyright protection.

16   17 U.S.C. Trans. Supp. Provs., Sec. 103.  Under the 1909 Act, a work had to bear a valid

17   copyright notice upon publication in order to secure copyright protection.  17 U.S.C. §§

18   10, 19 et. Seq. (1909 Act) See Twin Book Corp. v. Walt Disney Co., 83 F.3d. 1162, 1166

19   (9th Cir. 1996).  Works with defective notice were injected into the public domain

20   immediately upon publication from which the current Act furnished no rescue.  Steward

21   v. Abend, supra, 495 U.S. at 233.

22       The Talkartoon poster, which is attached as the first page to Ex. "A" to the

23   Valencia Dec., was published and distributed without any copyright notice being affixed

24   or included.  (Poole Op. ¶ 28; Ex. R to Winter Decl.; Valencia Decl. ¶ 9) It depicts Betty

25   Boop in her developed, female form, and was released in approximately August, 1931,

26   well prior to the release or copyright of any cartoons or booklets featuring Betty Boop in

27   her developed, female form.  (Poole Op. ¶ 28) (see, also, Ex. "S" to Winter Decl.)

28   Plaintiff has admitted it has no information regarding the publication of the Talkartoon

21

1    movie poster.  (Ex. A to Winter Decl., p. 133:20-22)

2         The Betty Boop character, therefore, was published without any copyright notice

3    and immediately entered the public domain.  Once entered, no copyright protection

4    existed.  As such, for this separate and independent reason, Plaintiff cannot claim

5    ownership of the copyright to Betty Boop.

6    **B.      Plaintiff's Claims For Trademark Infringement And Unfair Competition Are**

7           **Without Merit**.

8         In this case, Defendants have made use of copyrightable material that has made its

9    way into the public domain.  Plaintiff, by its claims for trademark infringement and unfair

10   competition, attempts to resurrect legal protection for that material via the Lanham Act.

11        **1.      Plaintiff Cannot Rely On The Lanham Act To Revive That Which Is In**

12               **The Public Domain**.

13        In Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003), the

14   Supreme Court strongly cautioned against misapplication of trademark law to reclaim that

15   which was previously protected by copyright but has since fallen into the public domain.

16   In Dastar, the publisher of a book on World War II granted exclusive television rights in a

17   book to an affiliate of a film corporation, which arranged for the production of a

18   television series based on the book.  Although the book's copyright was renewed, the

19   copyright on the television series was not, leaving the series in the public domain.  Many

20   years later, a rival company (Dastar) produced a video set by taking the tapes of the

21   original public domain version of the television series, and making minor modifications.

22   The rival company's video set and related advertising made no attribution to the owners of

23   the original book and television series or to the videotapes that the film corporation had

24   authorized.  Id. at 25.  The Ninth Circuit affirmed the District Court's grant of summary

25   judgment, finding that Dastar substantially copied the entire series, labeled the resulting

26   product with a different name and marketed it without attribution to the original producer,

27   and that such constituted trademark infringement under section 43(a) of the Lanham Act.

28   Id. at 28.   The Supreme Court reversed, holding:

                                        22

The right to copy, and to copy without attribution, once a copyright has expired, like "the right to make [an article whose patent has expired] -- including the right to make it in precisely the shape it carried when patented -- passes to the public." "In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." The rights of a patentee or copyright holder are part of a "carefully crafted bargain," under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution. Thus, in construing the Lanham Act, we have "careful to **caution against misuse or over-extension" of trademark and related protections into areas traditionally occupied by patent or copyright.** . . . Assuming for the sake of argument that Dastar's representation of itself as the "Producer" of its videos amounted to a representation that it originated the creative work conveyed by the videos, allowing a cause of action under § 43(a) for that representation would create a species of mutant copyright law that limits the public's "federal right to 'copy and use use,'" expired copyrights.

Id. at 33-34. (internal citations omitted) (emphasis added). The very same misuse and over-extension of the Lanham Act warned of in Dastar is precisely what Plaintiff seeks in this case.

In this case, Defendants found the old Betty Boop movie posters, which were entirely in the public domain, and created new artworks with further artistic enhancements. Using that artwork, it created designs that could be sold on figurines, t-shirts and other items. On its boxes and tags, the Defendants always identified themselves clearly, never as though they were the Plaintiff. Pursuant to Dastar, under these circumstances, there can be no confusion as to "origin" as a matter of the law. As long as the tangible goods were properly identified, as to source, the intellectual source of the public domain materials need not be attributed.

## 2.  Plaintiff Cannot Use The Lanham Act To "End-Run" Copyright Law.

Plaintiff's attempt to protect its alleged Betty Boop marks also runs squarely into the Ninth Circuit's holding in Comedy III Productions, Inc. v. New Line Cinema, 200 F.3d. 593 (9th Cir. 2000). In Comedy III, a scene in a movie released by the defendant showed a short clip from a Three Stooges film playing on a television in the background. The plaintiff argued that because the clip contained the name and characters of the Three Stooges, which were the subject of an enforceable trademark, the defendant's use of the clip violated the Lanham Act. Id. at 595

23

1    The Ninth Circuit flatly rejected the plaintiff's argument, holding that "the Lanham

2   Act cannot be used to circumvent copyright law." Comedy III, supra, 200 F.3d. at 595.

3   There was no question that the underlying work was covered by the Copyright Act and

4   the court explained: "[I]f material covered by the copyright law has passed into the public

5   domain, it cannot be protected by the Lanham Act without rendering the Copyright Act a

6   nullity." Id.

7    **3.    Plaintiff Cannot Prove Secondary Meaning And Likelihood of**

8        **Confusion.**

9    Assuming arguendo, that Plaintiff's Lanham Act claims are not defeated by the

10  attempt to circumvent the Copyright Act, in order to prevail on their trademark

11  infringement claim and Unfair Competition claims, Plaintiff must, at a minimum,

12  establish that its trademark rights in the asserted marks have achieved "secondary

13  meaning." Sony Pictures Entm't, Inc. v. Foreworks Entm't Group, Inc., 137 F.Supp.2d.

14  1177, 1195 (C.D. Cal. 2001). "Secondary meaning is another way of expressing the

15  distinctiveness of a trademark," and the "basic element" of secondary meaning is "the

16  mental association by a substantial segment of consumers and potential consumers"

17  between plaintiff's mark and a "single source of the product." Levi Strauss & Co. v. Blue

18  Bell, Inc., 778 F.2d. 1352 1354 (9th Cir. 1985) (en banc) (internal quotations omitted).

19   Secondary meaning and likelihood of confusion are both required here for

20  Plaintiffs' Lanham Act claims.  Where a trademark is asserted on a title or character that

21  has fallen out of copyright protection, a Lanham Act claim cannot proceed without proof

22  of secondary meaning and likelihood of confusion. Maljack Prods. v. Goodtimes Vidoe

23  Corp., 81 F.3d. 881, 887 (9th Cir. 1996); Sony Pictures, 137 F.Supp.2d. at 1995.

24   Plaintiff's mark "Betty Boop" serves one purpose - to describe the image of Betty

25  Boop that also appears on the products licensed by Plaintiff.  The mark "Betty Boop" on

26  the product does not evoke an association between the mark and a single source of the

27  product.  This is not like branding a car with "FORD," where a consumer who purchases

28  an automobile with a "FORD" emblem no longer thinks of Henry Ford, but instead

24

1   recognizes the mark as an indication of the source of the car.

2          In Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co., 197 F.2d. 293 (9th Cir. 1952)

3   (see, also, Dollcraft Co. v. Nancy Ann Storybook Dolls, Inc., 94 F.Supp. 1 (N.D. Cal.

4   1950)), the courts held that the character title "Red Riding Hood", and others could not

5   function as trademarks for dolls representing the characters, as they are merely

6   description of the dolls, and cancelled the plaintiffs registration: "Those names, as so

7   applied, are descriptive; their use belongs to everyone..." 94 F.Supp. at 5.  As the Ninth

8   Circuit further noted:

9              The Nancy Ann claim, if upheld, would lead to startling
               results.  Here are some well-known names which have for
10             years been in the public domain and a part of the literary
               background of almost every American child.  Manufacturers
11             surely cannot be allowed to reach into this public domain and
               appropriate portions thereof for their own exclusive use even
12             if thousands of other characters still remain in that domain
               unappropriated....It was found as a fact in the district court
13             that the names rejected as trade-marks by the trial judge were
               descriptive.  We agree.  They are descriptive and they are
14             descriptive of characters who bear the names, not the output
               of Nancy Ann.
15
16  Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co., 197 F.2d. 293, 295 (9th Cir. 1952).

17         In any event, Defendants' use of the restored historical movie posters in its licensed

18  products is ornamental, not as a source identifier.  The actual restored artwork is either

19  affixed to the product (like a T-shirt) or part of the packaging.  (See Valencia Decl. ¶ 11;

20  Ex. D)  As a matter of law, there can be no trademark infringement of Plaintiff's Betty

21  Boop marks.

22         Because Plaintiff's Second through Fifth causes of action each allege trademark

23  infringement as the predicate for the alleged unfair competition by Defendants, each fails

24  as a matter of law for all of the reasons stated above.

25  ///

26  ///

27  ///

28  ///

Defendants' Memo. of Points and Authorities In Support of Motion for Summary Judgment
@PFDesktop\::ODMA/MHODMA/RRLA;rrla;133925;1 74620 965

## V.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment, dismissing Plaintiff's complaint with prejudice.

DATED:   March 19, 2008

RILEY & REINER

By: _____

DOUGLAS D. WINTER
Attorneys for Defendants A.V.E.L.A.,
INC. d/b/a ART & VINTAGE
ENTERTAINMENT LICENSING
AGENCY, ART-NOSTALGIA.COM,
INC., and X ONE X MOVIE ARCHIVE,
INC., LEO VALENCIA

26

Defendants' Memo. of Points and Authorities In Support of Motion for Summary Judgment

@PFDesktop\:ODMA/MHODMA/RRLA,rrla,133925,1 74620 965

1

## PROOF OF SERVICE

2  STATE OF CALIFORNIA           )
                                )
3  COUNTY OF LOS ANGELES         )

4       I am employed in the County of Los Angeles, State of California, I am over the
   age of 18 and not a party to the within action; my business address is **[X]** 801 S.
5  Figueroa Street, 9th Floor, Los Angeles, California 90017 **[ ]** 1511 West Beverly Blvd.,
   Los Angeles, California 90026.

6

7       On March 19, 2008, I served the foregoing document(s) described as
   **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
   **SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on interested party(ies) in
8  this action by placing **[X]** a true copy **[ ]** the original thereof enclosed in a sealed
   envelope and addressed as follows:

9

   Mark S. Lee, Esq.                        Attorney for Plaintiff Fleischer Studios,
10 Manatt, Phelps & Phillips, LLP           Inc.
   11355 West Olympic Blvd.
11 Los Angeles, CA 90064-1614
                                            Tel: (310) 312-4000
12                                          Fax: (310) 312-4224
                                            email: mlee@manatt.com

13 **[X]**   **MAIL** (C.C.P. § 1013(a)) I am "readily familiar" with Riley & Reiner's practice
            of collection and processing correspondence for mailing. Under the practice it
14          would be deposited with the U.S. Postal Service on the same day with postage
            thereon fully prepaid at Los Angeles, California in the ordinary course of
15          business. I am aware that on motion of the party served, service is presumed
            invalid if postage cancellation date or postage date is more than one day after
16          date of deposit for mailing on affidavit.

17

         I declare under penalty of perjury under the laws of the State of California and
18 the United States that above is true and correct.

19       Executed on March 19, 2008 at Los Angeles, California.

20

21

22 EVELYN DIAZ

23

24

25

26

27

28